2020 IL App (1st) 191506-U

FOURTH DIVISION
December 3, 2020

No. 1-19-1506

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| | ) | No. 12 CR 13176 |
| ANTUAN JOINER, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Vincent M. Gaughan, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Affirming defendant's sentence where the record demonstrated the trial court considered all the mitigating evidence and did not abuse its discretion when sentencing the 16-year-old defendant within the statutory range for the offenses of first degree murder and attempted murder.

¶ 2   After a bench trial, 16-year-old defendant Antuan Joiner was convicted of first degree

murder (720 ILCS 5/9-1(a)(1) (West 2012)) and two counts of attempted murder (720 ILCS 5/8-

4(a) (West 2012)) and sentenced to 71 years' imprisonment in the Illinois Department of Corrections. He appealed his conviction and sentence to this court and, after affirming his conviction, we remanded the matter to the trial court to conduct a sentencing hearing in compliance with *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 90. The trial court was also charged to consider the new juvenile sentencing provisions making firearm enhancements discretionary upon resentencing. See *id.* ¶ 93.

¶ 3    On remand, the trial court ordered a new presentence investigation report and defense counsel was granted the opportunity to supplement the record with additional evidence in mitigation. After hearing arguments in the matter, the trial court declined to impose a firearm enhancement to any of the offenses and sentenced defendant to 28 years for first degree murder and six-year terms of imprisonment for the two counts of attempted murder to run concurrently to each other and consecutively to the first degree murder sentence for an aggregate sentence of 34 years' imprisonment.

¶ 4    In this appeal, defendant argues that the trial court abused its discretion because the sentence it imposed is at a great variance with the spirit and purpose of the law. Based on the reasons which follow, we affirm the judgment of the circuit court.

¶ 5                              BACKGROUND

¶ 6    As the seriousness of the offense is an important factor in this appeal, we incorporate the facts as previously iterated by this court. See *id.*

¶ 7    Defendant was charged by indictment in pertinent part with the first degree murder of Shakaki Asphy (Asphy) and the attempted murders of Leon and Thomas Cunningham. The indictment alleged that on June 16, 2012, defendant personally discharged a firearm in the direction of the victims and that defendant's actions caused the death of Asphy as well as serious

injury to Leon. Defendant, who was 16 years old at the time of the offense, was prosecuted as an adult (see 705 ILCS 405/5-130(1)(a)(i) (West 2012)). The matter then proceeded to a bench trial.

¶ 8        Leon Cunningham testified as follows. On June 16, 2012, he was 18 years old and a member of the Gangster Disciples, "70th Set" (a faction within the Gangster Disciples street gang). He was also bound to a wheelchair because he is paralyzed from the waist down. At 7 p.m., he was socializing with friends, including Thomas and Asphy, outside an abandoned building on the 2000 block of West 70th Place when he observed a gray vehicle drive past. Leon testified that he observed defendant, who he knew by the nickname "Monkey Man," inside the vehicle. Leon explained that while he did not know defendant personally, he had seen him around the neighborhood and was aware defendant was a member of the "D-Block" faction of the Gangster Disciples. According to Leon, when the vehicle drove past he felt something was "wrong," but nevertheless remained outside the house.

¶ 9        Shortly thereafter, everyone except Leon, Thomas, and Asphy left. Leon was in his wheelchair at the base of the porch stairs, Thomas was standing at the top of the stairs, and Asphy was perched on the porch railing near the top of the stairs. Suddenly, Leon observed a man wearing a black hooded sweatshirt, with the hood drawn over his head, appear in the east-side gangway of the abandoned building holding a firearm. Leon identified this individual as defendant, who he continued to refer to by his nickname, "Monkey Man." Leon testified he was 10 or 15 feet away from defendant when he began shooting. Leon further testified that he had a clear view of the weapon, which he identified as a semiautomatic "9" with an "extended clip." As defendant fired his weapon, Thomas ran from the porch. With nowhere to go, Leon remained at the base of the porch.

¶ 10    After the shooting ceased, Leon observed defendant run back through the gangway. Leon noticed Asphy lying on the porch and wheeled himself over toward his own home next door to seek assistance, but remained outside on the sidewalk. Shortly thereafter he recognized that he was bleeding, having been shot in the left knee. Paramedics and police officers arrived and removed both Leon and Asphy in separate ambulances to Christ Hospital. Leon testified that when he was at the hospital, he informed the police officers that "Monkey Man" shot him but did not provide them with a physical description of the perpetrator.

¶ 11    Leon further testified that the following day, a detective visited him at the hospital and presented him with a photo array. According to Leon, "Monkey Man" was not depicted in the photo array. On June 18, 2012, Leon was presented with a second photo array and identified defendant as the perpetrator of the offense.

¶ 12    On cross-examination, Leon testified that the gray automobile drove past him quickly and did not stop, so he was "guessing" that he observed "Monkey Man" inside the vehicle. He further testified that he was "guessing" that defendant was a member of "D-Block." Leon also testified that there were "problems," *i.e.*, shootings, between the "70th Set" and the "D-Block." Leon testified that he had fought with members of "D-Block," but not with defendant personally.

¶ 13    Leon also testified that he did not inform the responding officers that "Monkey Man" had shot him but did relay to the paramedics that he observed the shooter. He did not, however, inform the paramedics that "Monkey Man" shot him.

¶ 14    Leon further testified on cross-examination that his brother Thomas visited him at the hospital on June 19, 2012, and they discussed the shooting and their desire to find the perpetrator. Leon was also extensively questioned regarding the color of the hooded sweatshirt, and, even after being impeached with his grand jury testimony, insisted the sweatshirt was black

and not gray.

¶ 15   Thomas Cunningham, who was 17 years old at the time of the incident, testified that on June 16, 2012, at 7 p.m., he was sitting on the porch of an abandoned house with Leon and Asphy celebrating a friend's birthday and smoking marijuana.  Leon was in his wheelchair at the base of the stairs.  Thomas then observed "Monkey Man" come through the gangway with a gray hood tied around his head.[1]  Thomas identified "Monkey Man" as defendant and testified he had known him from the neighborhood "for a while."  Defendant was 10 feet away from Thomas and his face was clearly visible despite the hood being tied around it.  At that moment, defendant then started firing his weapon, initially toward Asphy and then at him.  Thomas ducked behind the brick porch wall then he jumped off the porch and ran across a vacant lot.  When he could no longer hear gunfire, Thomas returned to the abandoned house and discovered Asphy lying on the porch.  Thomas was unaware his brother had also been shot and left the scene before his brother was placed in the ambulance.

¶ 16   On the evening of June 18, 2012, police officers came to Thomas' residence and requested he come to the police station to view a lineup.  Thomas, accompanied by his mother, viewed a lineup at the police station where he identified defendant as the individual who had shot at him.

¶ 17   On cross-examination, Thomas testified that Leon was also smoking marijuana at the time of the shooting.  Thomas further testified that he did not tell the responding officers that defendant shot at him, nor did he go to the police station of his own volition to inform them of the identity of the shooter.  Thomas also testified that he went to the hospital to visit his brother on June 18, 2012.  Thomas further testified that while he had spoken with Leon prior to

---

[1] When Thomas first references defendant, the trial transcript indicates he said "Money Man came through the gangway."  Thereafter, Thomas refers to defendant as "Monkey Man."

identifying defendant in the lineup, they did not discuss the identity of the shooter.

¶ 18    Thomas was also extensively questioned by defense counsel as to how he was acquainted with defendant.  Thomas testified that he knew defendant from the neighborhood for "a couple of years," but when pressed to give a precise number, Thomas replied colloquially that, "I known [*sic*] him for a minute.  I can't give you no years.  I know him from the neighborhood."  Thomas further testified that he was not friends with defendant and had never spoken with him.  Thomas also testified that he was surprised that defendant would "come and shoot" him "[b]ecause I ain't never did nothing to [the] dude [*sic*]."

¶ 19    Cornelius Byther (Byther) testified that at 7 p.m. on June 16, 2012, he was washing his vehicle in the alley in the 7100 block of South Damen Avenue when he heard some "pops" coming from the north.  Minutes later, in the corner of his eye, he noticed two young men running south in the alley toward him.  He could not recall what they were wearing and did not observe their faces.  He did, however, see them climb over a garbage can and jump over a fence to an abandoned house.  Shortly thereafter the police arrived and Byther informed them of what he had observed.

¶ 20    Officer Lester Vaughan (Vaughan) of the Chicago police department testified that on June 16, 2012, he responded to a call of shots fired in the area of 70th Place and Damen Avenue.  Vaughan and his partner, Marshaun Wright (Wright), responded instead to the area of West 71st Street and South Seeley Avenue based on their knowledge of a gang feud between "D-Block" and the "70th Set."  Specifically, Vaughan went to an abandoned building on the 7100 block of South Seeley Avenue, which was used by "D-Block" members.  Approaching the house from the rear, Vaughan observed an open basement door and a black baseball cap on the stairs going down to the basement.  Vaughn and Wright proceeded into the basement to look for an offender.

In doing so, he observed a gray hooded sweatshirt on the floor with a 9mm handgun on top of it and he noticed a loaded magazine "not too far from where the weapon was." He secured the area and called for an evidence technician. Photographs taken by the evidence technician were admitted into evidence which depicted the back of the abandoned house spray painted with "D-Block" graffiti. Also admitted into evidence were photographs of the black baseball cap on the steps, the gray hooded sweatshirt with a handgun on top, and the magazine with bullets on a nearby windowsill.

¶ 21    The following day, Vaughan was assigned to look for defendant. He went to defendant's residence and spoke with defendant's mother, after which he and Wright located defendant and placed him into custody.

¶ 22    On cross-examination, Vaughan testified that he was inside the abandoned house on Seeley Avenue five minutes after he was notified of the shooting. Vaughan further testified that defendant resided in the 1300 block of West 77th Street and was arrested without incident.

¶ 23    Officer Steve Swain (Swain), an evidence technician with the Chicago police department, testified he received an assignment on June 16, 2012, at 7:46 p.m. to process a scene on the 2000 block of West 70th Place. Upon viewing the scene, Swain discovered seven cartridge casings he believed originated from a semiautomatic pistol. These casings were inventoried and forwarded to the lab for analysis. Swain then relocated to the abandoned house on the 7100 block of South Seeley Avenue where he photographed the alley and processed a garbage can, which had what appeared to be handprints and footwear marks on top of the lid. Swain also recovered a black baseball hat, a gray sweatshirt, a handgun, and a loaded magazine. These items were then processed and inventoried by Swain. On cross-examination, Swain explained that in processing the handgun, he swabbed areas of the weapon where more DNA would likely exist, such as the

handle.

¶ 24    Detective Marc Delfavero (Delfavero) of the Chicago police department testified that on June 16, 2012, he received an assignment to investigate a shooting that had occurred.  Delfavero went to Christ Hospital with his partner, Detective William Meador (Meador), to locate the victims.  Delfavero then spoke with Leon, who was being treated in the emergency room.  Leon informed him that "Monkey Man" shot him.  Delfavero was unsuccessful in interviewing Asphy, as she was in surgery at that time.  Delfavero then proceeded to the scene of the offense where he observed the cartridge casings.  Thereafter he traveled to the abandoned house on South Seeley Avenue where he observed the hat, sweatshirt, handgun, and magazine.

¶ 25    The following day, Delfavero learned that Asphy had succumbed to her wounds. Delfavero then prepared a photo array and returned to Christ Hospital that evening where he met with Leon.  Delfavero read Leon the photo spread advisory form, which Leon signed, and presented him with the photo array.  Leon, however, did not make an identification from that array.  Leon then advised Delfavero that the suspect had "smaller twists braids in his hair and he had also been shot in the area of 71st and Winchester a few months prior to this."

¶ 26    On June 18, 2012, Delfavero and Meador reviewed police reports and then went to Dunbar High School where they met with a school official.  Following a conversation with him, the detectives received a photograph of defendant.  The detectives returned to the police station, prepared a new photo array, and returned to Christ Hospital where they presented it to Leon at 5:20 p.m.  After signing the photo spread advisory form, Leon identified defendant's photo as that of "Monkey Man," the individual who shot him and Asphy.  Delfavero informed tactical officers of the identification and subsequently defendant was placed in custody at 7 p.m.

¶ 27    Thereafter, Delfavero picked up Thomas and Thomas' mother at their home and

transported them to the police station where Thomas was to view a physical lineup. Prior to viewing the lineup, Thomas was provided and read a lineup advisory form, which he and his mother signed. Upon viewing the lineup, Thomas identified defendant as the shooter.

¶ 28    On cross-examination, Delfavero testified that after defendant was in custody, a woman (whose name he could not recall) provided him with information that pointed to another suspect. Delfavero, however, determined there was no need to follow up based on that information. Delfavero explained that while this woman voluntarily relayed this information to him, she refused to speak with a State's attorney or provide a statement.

¶ 29    The parties entered into various stipulations, which included fingerprint and deoxyribonucleic acid (DNA) test results regarding defendant and another individual, Matthew Smith. The stipulations established as follows. The gray hooded sweatshirt tested positive for gunshot residue, indicating that it had come in contact with an item that had gunshot residue on it, or it had been in the environment of a discharged firearm. The recovered handgun was tested and determined to be the same firearm which fired the cartridge casings recovered from the scene of the shooting. No suitable fingerprints were discovered on the handgun, the magazine, or the cartridge. However, two fingerprint lifts from the garbage can in the alley were tested and neither were found to be a match for defendant or Matthew Smith.

¶ 30    The parties also stipulated to the DNA analysis of the gray hooded sweatshirt, black baseball hat, and handgun. The DNA analysis revealed that there was a mixture of DNA profiles on these items but excluded defendant as a potential donor to these mixtures. The parties, however, further stipulated that it is possible to wear an article of clothing or handle a handgun and not leave enough DNA to be detected. Additionally, the stipulation provided that Matthew Smith was excluded as a potential donor to the DNA profile on the sweatshirt but could not be

excluded as a potential donor to the DNA profile on the baseball hat or the handgun. The stipulation further indicated that the chances a random individual would be included in the DNA mixture on the baseball hat is "1 in 6 Black, 1 in 23 White, or 1 in 14 Hispanic unrelated individuals" and the chances a random person would be included in the DNA mixture on the handgun is "1 in 4 Black, 1 in 5 White or 1 in 4 Hispanic individuals."

¶ 31    The State rested and the defense moved for a directed finding, which was denied. Defendant then presented the testimony of Debra Bartecki (Bartecki), a paramedic with the Chicago fire department. Bartecki testified that on June 16, 2012, she responded to the scene on West 70th Place at 7:09 p.m. where she treated Leon. Bartecki inquired where Leon was hurt and how he became injured. Leon informed Bartecki that he had been shot, but that he had a condition where he could not feel his legs. During the seven minute drive to Christ Hospital, Leon did not say who shot him, nor did Bartecki so inquire. In fact, Leon did not provide her with any details about how he came to be shot.

¶ 32    The defense then rested, and the parties presented closing arguments. The State argued that Leon and Thomas were credible witnesses and that it proved all of the elements of the offenses charged. The defense, on the other hand, argued Leon and Thomas were not credible and emphasized that there was no DNA evidence linking defendant to the physical evidence. The defense further argued that the State presented no motive for defendant to commit this offense.

¶ 33    After considering the evidence and hearing closing arguments, the trial court ultimately found defendant guilty of murder and two counts of attempted first degree murder.

¶ 34    Thereafter, defendant presented a motion for a new trial. At the hearing on the motion, defense counsel argued that the trial court improperly shifted the burden of proof onto defendant.

The trial court addressed this claim stating, "Just for clarification, the burden never shifts, the burden of proof never shifted to the defense. If there was any ambiguity, I just want to clarify that." The trial court then denied the motion.

¶ 35 After hearing arguments in aggravation and mitigation, as well as reviewing the presentencing investigation report, the trial court imposed the mandatory minimum sentence of 45 years' imprisonment for the first degree murder conviction. This sentence consisted of the minimum 20-year sentence for murder (see 730 ILCS 5/5-4.5-20(a) (West 2012) (providing a range of 20 to 60 years)), plus a minimum 25-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012)). The court also sentenced defendant to 26 years' imprisonment for each of the two attempted murder convictions. The 26-year sentences consisted of the minimum 6-year sentence for attempted murder (see 730 ILCS 5/5-4.5-25(a) (West 2012)), plus a 20-year mandatory firearm enhancement (see 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2012)). In addition, the trial court determined that while defendant's sentences for first degree murder and attempted murder would run consecutively, the two convictions for attempted murder would run concurrently. As a result, defendant was sentenced to a mandatory minimum aggregate sentence of 71 years' imprisonment. Further, in light of the truth in sentencing statute (730 ILCS 5/3-6-3 (West 2012)), defendant would be required to serve a minimum of 66 years of the 71-year sentence imposed before he would be eligible for release.

¶ 36 Defendant appealed arguing his counsel was ineffective, the State failed to prove beyond a reasonable doubt that he was the perpetrator of the offense, his due process rights were violated, his sentence was unconstitutional, and the new juvenile sentencing provisions making firearm enhancements discretionary applied retroactively to his case. We affirmed his conviction but remanded the matter for resentencing after finding the trial court failed to expressly consider

the *Miller* factors when sentencing defendant. In turn, we observed that upon resentencing the defendant may elect to be sentenced under the law in effect at the time of the new sentencing hearing. *Id.* (quoting *People v. Hunter*, 2017 IL 121306, ¶ 54).

¶ 37    On remand, the trial court ordered a new presentence investigation report and further ordered the probation department to consider all of the juvenile sentencing factors (730 ILCS 5/5-4.5-105 (West 2018)) in the report. The new presentence investigation report indicated that defendant was suspended from elementary school less than five times for offenses related to fighting and disrespect from others. In addition, defendant received special education in school for behavioral disorders beginning in fourth grade due to fighting. Defendant, however, denied receiving special education for a learning disorder and he also denied having any gang affiliation. In contrast, the Chicago Police Department's gang records reflected defendant was affiliated with a street gang.

¶ 38    Defense counsel also hired a private mitigation specialist who prepared a 101-page mitigation report, which was admitted into evidence without objection during the sentencing hearing. This mitigation report included a 14-page summary detailing defendant's childhood and background and had over 80 pages of Illinois Department of Corrections records. These records indicated that defendant had never been disciplined while an inmate. They further indicated that defendant came from a strong, loving family and that his family never wavered in their support for him while he has been incarcerated.

¶ 39    On June 13, 2019, the trial court conducted a sentencing hearing. In aggravation, the State presented the court with the victim impact statements of Asphy's parents, which were already a part of the original sentencing hearing. The State also acknowledged that defendant had no criminal background despite growing up in a violent, gang-ridden neighborhood. The

State noted, however, that despite having strong family support defendant still chose to commit the offenses for which he was found guilty.

¶ 40    In mitigation, defense counsel stressed defendant's strong, loving household and the continued support defendant received from his family.  Defense counsel also reminded the trial court that it had sentenced defendant to the minimum sentence at his original sentencing hearing and requested the court impose the minimum sentence again.  At defense counsel's request the trial court admitted defendant's prison disciplinary records into evidence.  They demonstrated that defendant had not been disciplined while in prison.  According to defense counsel, these records established that defendant was capable of rehabilitation and maintained that, under *Miller*, defendant would be someone who could benefit from a minimum sentence.

¶ 41    In rendering its sentence, the trial court first acknowledged *Miller* and the fact defendant was 16 years old at the time of the offense.  The court then found that defendant had demonstrated that he was in the process of rehabilitating himself, pointing to defendant's impeccable disciplinary record as evidence.  The court also acknowledged that at the time it originally sentenced defendant in 2014 it fashioned his sentence based on the sentencing statutes in effect at the time and therefore sentenced defendant to the minimum term of years plus enhancements.  Presently, in contrast, it was no longer bound by the statutory sentencing requirements and therefore the trial court declined to impose any enhancement on defendant's sentences.  Accordingly, the trial court sentenced defendant to 28-years imprisonment for first degree murder and 6 years as to each of the attempted murder convictions to be served concurrently but consecutive to the 28-year sentence for an aggregate sentence of 34 years.

¶ 42    Defendant filed a motion to reconsider his sentence, which was denied.  This appeal followed.

¶ 43                                          ANALYSIS

¶ 44     On appeal, defendant asserts that the trial court abused its discretion when it sentenced

him to 34 years' imprisonment as opposed to the minimum 26-year sentence.  According to

defendant, the trial court failed to honor the spirit and purpose of the law and the constitutionally

mandated objective of rehabilitation.  Defendant thus requests this court should reduce his

sentence to the statutory minimum.

¶ 45     In response, the State maintains that the trial court considered the factors in aggravation

as well as all the evidence in mitigation before pronouncing its sentence, which fell within the

statutory parameters and complied with *Miller*.  The State further argues that given the

aggravating factors and the seriousness of the offense, defendant's sentence was not excessive.

The State contends defendant's argument is merely an attempt to have this court improperly

reweigh the evidence presented in aggravation and mitigation and substitute this court's

judgment for that of the trial court.

¶ 46     The law in this area is well-established.  A reviewing court will not disturb the trial

court's sentencing decision absent an abuse of discretion.  *People v. Sharp*, 2015 IL App (1st)

130438, ¶ 134.  The trial court abuses its discretion when its decision is "fanciful, arbitrary, or

unreasonable to the degree that no reasonable person would agree with it."  *People v. Ramos*,

353 Ill. App. 3d 133, 137 (2004).  Where, as here, the defendant's sentence falls within the

prescribed statutory limits, the reviewing court will not find an abuse of that discretion unless the

sentence is greatly at variance with the purpose and spirit of the law or is manifestly

disproportionate to the offense.  *People v. Means*, 2017 IL App (1st) 142613, ¶ 14.

¶ 47     Here, defendant was convicted of first-degree murder, for which the sentencing range is

from 20 to 60 years' imprisonment. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018); 730 ILCS 5/5-4.5-20(a) (West 2018). Defendant was sentenced to 28 years, on the low end of the spectrum. Defendant was also convicted of two counts of attempted murder, for which the sentencing range is from six to 30 years. 720 ILCS 5/8-4(c) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). Defendant was sentenced to the statutory minimum of six-year terms on both counts. We observe that while the trial court specially found that defendant personally discharged the firearm in the commission of these offenses, there is no longer a statutory requirement that a sentencing enhancement be imposed where the defendant was a juvenile at the time of the offenses. See *Hunter*, 2017 IL 121306, ¶ 54. In the aggregate, defendant was sentenced to 34 years' imprisonment, a sentence that is well within the statutory sentencing range and is therefore presumptively proper. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105 ("When a trial court imposes a sentence within the permitted statutory range, as occurred in the case at bar, a reviewing court will start with the presumption that it is proper.").

¶ 48    We further observe that under our supreme court's decision in *People v. Buffer*, 2019 IL 122327, a 40-year sentence for a juvenile defendant is considered a *de facto* life sentence. Here, defendant was originally sentenced to 71 years' imprisonment. On remand, the trial court ordered a new presentence investigation report which was required to include information regarding the *Miller* factors and further allowed defense counsel to supplement the record with additional mitigating evidence. After hearing arguments in aggravation and mitigation and considering the new evidence, the trial court noted defendant's age, his rehabilitative potential, the *Miller* decision and its progeny, and sentenced defendant to an aggregate sentence of 34 years' imprisonment. Defendant's 34-year sentence falls below the threshold set by our supreme court in *Buffer*.

¶ 49    While defendant acknowledges that his sentence is within the statutory range and does not implicate *Buffer*, he maintains that it nevertheless must be reduced because defendant's strong family background and rehabilitative potential do not support a "midrange" sentence.

¶ 50    A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship.  Ill. Const. 1970, art. I, § 11; *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48.  While a trial court must consider all factors in aggravation and mitigation, the seriousness of the offense, rather than mitigating evidence, is the most important factor in sentencing.  *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94.  The trial court is presumed to consider "all relevant factors and any mitigation evidence presented" (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48), but has no obligation to recite and assign a value to each factor (*People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011)).

¶ 51    Furthermore, in fashioning a sentence, the trial court must consider all of the factors in mitigation and aggravation (*People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27), and the particular circumstances of each case (*People v. Fern*, 189 Ill. 2d 48, 53 (1999)).  We presume the trial court considered all of the relevant factors before it, and without affirmative evidence that the sentencing court failed to consider evidence in mitigation, that presumption cannot be overcome.  *McWilliams*, 2015 IL App (1st) 130913, ¶ 27.  We defer to the trial court's judgment on sentencing as the lower court, " 'having observed the defendant and the proceedings, has a far better opportunity to consider [sentencing] factors than the reviewing court, which must rely on the 'cold' record.' " *People v. Alexander*, 239 Ill. 2d 205, 213 (2010) (quoting *Fern*, 189 Ill. 2d at 53).  We may not reverse defendant's sentence merely because we would have weighed the factors in aggravation and mitigation differently.  *Ramos*, 353 Ill. App. 3d at 137.  Nor will we find that a minimum sentence is necessarily warranted simply due to the existence of some

mitigating factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Moreover, the existence of mitigating factors does not preclude imposition of the maximum sentence. *People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001).

¶ 52    The trial court was in the best position to consider the sentencing factors (*Alexander*, 239 Ill. 2d at 212-13) and it is not our function to reweigh them (*People v. Streit*, 142 Ill. 2d 13, 19 (1991)). Accordingly, we conclude that defendant fails to make an affirmative showing that the trial court abused its discretion by imposing a "midrange" sentence. See *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51. In rendering this determination, we observe that defendant has provided us with no case law in support of his argument that a "midrange" sentence alone constitutes an abuse of discretion. Defendant does, however, cite numerous cases where the trial court considered the defendant's family relationships and childhood as mitigating evidence. *People v. Daly*, 2014 IL App (4th) 140624, ¶ 33; *People v. Brown*, 2015 IL App (1st) 130048, ¶ 45; *People v. Geneva*, 196 Ill. App. 3d 1017, 1031 (1990). Yet, he does not argue that the trial court failed to take this mitigating factor into consideration when he rendered the sentence. Such a failure could be deemed an abuse of discretion but where, as here, the record clearly demonstrates that defendant's childhood and strong, loving family relationships were considered by the trial court, we decline to find the 34-year sentence was the product of an abuse of discretion.

¶ 53    In conclusion, we believe it is imperative to stress the seriousness of this offense and the effect it had on the victim's family and our community at large. "A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 68. However, "[t]he seriousness of the offense, and not mitigating evidence, is the most important sentencing factor." *Id.* Here, defendant

discharged a semiautomatic firearm in a residential neighborhood in broad daylight. Defendant did so from the sidewalk in public view. The record also established that defendant's motivation behind the shooting was gang-related as Leon was an admitted member of a faction of a street gang that was engaged in a feud with defendant's faction. Notably, this gang feud had resulted in prior violence. Despite this shooting being gang-related, the evidence demonstrated that defendant did not aim his weapon at another gang member initially, but instead chose to point his weapon first at Asphy, killing her. He then turned to shoot at Leon, who was in a wheelchair and could not easily escape. The evidence at trial demonstrated this was a serious offense that involved multiple victims. This court will not reweigh the sentencing factors or substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 213. Based on the record before us, we cannot say that the sentence imposed by the court is excessive, manifestly disproportionate to the nature of the offense, or that it departs significantly from the intent and purpose of the law. *Fern*, 189 Ill. 2d at 56. Accordingly, we find no basis to disturb the trial court's judgment.

¶ 54                                 CONCLUSION

¶ 55     For the reasons set forth above, we affirm the judgment and sentence of the circuit court of Cook County.

¶ 56     Affirmed.