2023 IL App (1st) 211553

First District
Third Division
May 24, 2023

No. 1-21-1553

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 13176 |
| ANTUAN JOINER, | ) ) | |
| Defendant-Appellant. | ) ) ) ) | Honorable Vincent M. Gaughan, Judge Presiding. |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice D.B. Walker dissented, with opinion.

## OPINION

¶ 1    Defendant, Antuan Joiner, appeals the circuit court of Cook County's summary dismissal of his post-conviction petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)).

¶ 2    After a bench trial, 16-year-old defendant Antuan Joiner was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and two counts of attempted murder (*id.* § 8-4(a)) and sentenced to 71 years' imprisonment in the Illinois Department of Corrections. He appealed his conviction and sentence to this court and, after affirming his conviction, we remanded the matter to the trial court to conduct a new sentencing hearing. See *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 90. On remand, the trial court resentenced defendant to 34 years' imprisonment.

Defendant appealed his new sentence, and this court affirmed, finding that the trial court did not abuse its discretion when resentencing defendant. *People v. Joiner*, 2020 IL App (1st) 191506-U, ¶¶ 3-4, 53.

¶ 3    Thereafter, defendant filed a postconviction petition, which the trial court summarily dismissed as frivolous and patently without merit. Defendant now appeals that summary dismissal, arguing that the trial court should have advanced defendant's petition to the second stage, since the trial court failed to rule on the petition within 90 days after it was filed and docketed. Further, defendant argues that his petition sufficiently set forth a *Brady* violation claim (*Brady v. Maryland*, 373 U.S. 83 (1963)), ineffective assistance of trial counsel claims, and an actual innocence claim. For the following reasons, we affirm.

¶ 4                                 BACKGROUND

¶ 5    Defendant was charged by indictment with the first degree murder of Shakaki Asphy (Asphy) and the attempted murders of Thomas Cunningham (Thomas) and Leon Cunningham (Leon). The indictment alleged that on June 16, 2012, defendant personally discharged a firearm in the direction of the victims and that defendant's actions caused the death of Asphy, as well as serious injury to Leon. On October 15, 2014, the matter proceeded to a bench trial.

¶ 6    Leon Cunningham testified as follows. On June 16, 2012, around 7 p.m., he was socializing with friends, including Thomas and Asphy, outside an abandoned building on the 2000 block of West 70th Place when he observed a gray vehicle drive past. Leon testified that he observed defendant, who he knew by the nickname "Monkey Man," inside the vehicle. Leon explained that while he did not know defendant personally, he had seen him around the neighborhood and was aware defendant was a member of the "D-Block" faction of the Gangster Disciples. According to Leon, when the vehicle drove past, he felt something was wrong, but he

remained outside the building.

¶ 7    Shortly after, everyone but Leon, Thomas, and Asphy left. Leon, who was in a wheelchair, was at the base of the porch stairs, Thomas was standing at the top of the stairs, and Asphy was perched on the porch railing near the top of the stairs. Suddenly, Leon observed a man wearing a black hooded sweatshirt, with the hood drawn over his head, appear in the east-side gangway of the abandoned building. The man was holding a firearm. Leon identified this individual as defendant, whom he continued to refer to by the nickname "Monkey Man." Leon testified that he was 10 or 15 feet away from defendant when defendant commenced shooting. Leon further testified that he had a clear view of the weapon, which he identified as a semiautomatic "9" with an "extended clip." As defendant fired his weapon, Thomas ran from the porch, and with nowhere to go, Leon remained at the base of the porch.

¶ 8    After the shooting, Leon observed defendant run back through the gangway. Leon observed Asphy lying on the porch, so he wheeled himself toward his own home next door to ask for help, staying outside on the sidewalk. He then noticed that he had been shot in the left knee and had been bleeding. Paramedics and police officers then arrived and placed Leon and Asphy in separate ambulances that went to Christ Hospital. Leon testified that when he was at the hospital, he informed the police officers that "Monkey Man" shot him but did not provide them with a physical description of the perpetrator.

¶ 9    Leon further testified that the following day, a detective visited him at the hospital and presented him with a photo array. According to Leon, "Monkey Man" was not depicted in the photo array. On June 18, 2012, Leon was presented with a second photo array and identified defendant as the perpetrator of the offense.

¶ 10    On cross-examination, Leon testified that the gray automobile drove past him quickly and

did not stop, so he was "guessing" that he observed "Monkey Man" inside the vehicle. He further testified that he was "guessing" that defendant was a member of "D-Block." Leon acknowledged that there were "problems" between the "70th Set," the faction of the Gangster Disciples he belonged to, and "D-Block." Leon, however, testified that while he had fought with members of "D-Block," he had not fought with defendant personally. Leon also testified that he did not inform the responding officers or paramedics that "Monkey Man" shot him but did inform paramedics that he observed the shooter. Leon further testified on cross-examination that his brother Thomas visited him at the hospital on June 19, 2012, and that they discussed the shooting and their desire to find the offender.

¶ 11     Thomas Cunningham testified that on June 16, 2012, at 7 p.m., he was sitting on the porch of an abandoned house with Leon and Asphy, celebrating a friend's birthday and smoking marijuana. Leon was in his wheelchair at the base of the stairs. Thomas then observed "Monkey Man" come through the gangway with a gray hood tied around his head.[1] Thomas identified "Monkey Man" as defendant and testified he had known him from the neighborhood "for a while." Defendant was 10 feet away from Thomas, and his face was clearly visible, despite the hood being tied around it. At that moment, defendant started firing his weapon first at Asphy and then at Thomas. Thomas ducked behind the brick porch wall and then jumped off the porch and ran across a vacant lot. When he no longer heard gunfire, Thomas returned to the abandoned house and discovered Asphy lying on the porch. Thomas was unaware that his brother had also been shot, and Thomas left the scene before his brother was placed in the ambulance.

¶ 12     On the evening of June 18, 2012, police officers came to Thomas's residence and requested that he come to the police station to view a lineup. Thomas and his mother viewed a

---

[1]When Thomas first referenced defendant, the trial transcript indicates he said, "Money Man came through the gangway." Thereafter, Thomas refers to defendant as "Monkey Man."

lineup at the police station, where he identified defendant as the individual who had shot at him.

¶ 13    On cross-examination, Thomas testified that Leon was also smoking marijuana at the time of the shooting. Thomas further acknowledged that he did not tell the responding officers that defendant shot at him and that Thomas did not willingly visit the police station to tell officers the shooter's identity. Thomas also testified that he went to the hospital to visit his brother on June 18, 2012. Although he had spoken to Leon prior to identifying defendant in the lineup, they did not discuss the identity of the shooter.

¶ 14    Thomas was questioned at trial as to how he knew defendant. Thomas testified that he knew defendant from the neighborhood for "a couple of years," and when asked to give a precise number, Thomas replied, "I known him for a minute. I can't give you no years. I know him from the neighborhood." Thomas further testified that he was not friends with defendant and had never spoken with him. Thomas also testified that he was surprised that defendant would shoot at him "[b]ecause I ain't never did nothing to [the] dude."

¶ 15    Officer Steve Swain (Swain), an evidence technician with the Chicago Police Department, testified he was assigned to process a scene on the 2000 block of West 70th Place. There, Swain discovered seven cartridge casings he believed were from a semiautomatic pistol. These casings were inventoried and forwarded to the lab for analysis. Swain then relocated to an abandoned house, where he photographed the alley and processed a garbage can, which appeared to have handprints and shoe marks on the lid. Swain also recovered a black baseball hat, a gray sweatshirt, a handgun, and a loaded magazine. These items were then processed and inventoried by Swain.

¶ 16    Detective Marc Delfavero (Delfavero) of the Chicago Police Department testified that on June 16, 2012, he was assigned to investigate a shooting. Delfavero went to Christ Hospital with

his partner, Detective William Meador (Meador), to find the victims. Delfavero then spoke with Leon, who was being treated in the emergency room. Leon informed him that "Monkey Man" shot him. Delfavero was unsuccessful in interviewing Asphy, as she was in surgery. Delfavero then proceeded to the scene of the offense, where he observed cartridge casings. Thereafter, he traveled to the abandoned house on South Seeley Avenue, where he observed the hat, sweatshirt, handgun, and magazine. The following day, Delfavero learned that Asphy had passed away. On that evening, Delfavero prepared a photo array and returned to Christ Hospital, where he met with Leon. Leon read and signed a photo spread advisory form. When presented with the photo array, however, Leon did not make an identification. Leon advised Delfavero that the suspect had "smaller twists [*sic*] braids in his hair and he had also been shot in the area of 71st and Winchester a few months prior to this."

¶ 17    Two days later, Delfavero and Meador reviewed police reports and went to Dunbar High School, where they met with a school official. Following a conversation with him, the detectives received a photograph of defendant. The detectives prepared a second photo array and returned to Christ Hospital. After signing the photo spread advisory form, Leon identified the photo of defendant as "Monkey Man," the individual who shot him and Asphy. Delfavero informed officers of the identification, and subsequently, defendant was placed in custody.

¶ 18    Thereafter, Delfavero picked up Thomas and his mother at their home and transported them to the police station, where Thomas viewed a lineup. After viewing the lineup, Thomas identified defendant as the shooter.

¶ 19    On cross-examination, Delfavero was asked whether he spoke to a woman named "Kenya Donner" about a potential second suspect. Delfavero responded that a woman, whose name he could not recall, provided him with information that pointed to another suspect.

Thereafter, Delfavero was asked whether "Ms. Donner had an exhaustive conversation with you and your partner," and Delfavero replied "[y]es" and said that she came to the police station and voluntarily provided him with information.

¶ 20    The parties entered into several stipulations as to the fingerprint and DNA test results. The stipulations established as follows. The gray hooded sweatshirt tested positive for gunshot residue, either indicating that the sweatshirt had touched another item with gunshot residue on it or indicating that the sweatshirt had been in the environment of a discharged firearm. The recovered handgun was tested and found to be the same firearm which fired the cartridge casings recovered from the scene of the shooting. No suitable fingerprints were discovered on the handgun, the magazine, or the cartridge. Two fingerprint lifts from the garbage can in the alley were tested, and neither were found to be a match for defendant.

¶ 21    The parties also stipulated to the DNA analysis of the gray hooded sweatshirt, black baseball hat, and handgun. The DNA analysis revealed that there was a mixture of DNA profiles on the sweatshirt, hat, and handgun, but the analysis excluded defendant as a potential donor to these mixtures. The parties, however, stipulated that someone can wear clothes or hold a handgun and not leave enough DNA to be detected. In addition, the stipulation provided that another individual, Matthew Smith, could be excluded as a potential donor to the sweatshirt's DNA profile but could not be excluded as a potential donor to the hat or handgun's DNA profile. The stipulation further provided that the chances a random person would be included in the DNA mixture on the baseball hat is "1 in 6 Black, 1 in 23 White or 1 in 14 Hispanic unrelated individuals" and the chances a random person would be included in the DNA mixture on the handgun is "1 in 4 Black, 1 in 5 White or 1 in 4 Hispanic individuals."

¶ 22    The State rested. The defense moved for a directed finding, and the trial court denied the

motion. Defendant called Debra Bartecki (Bartecki), a paramedic with the Chicago Fire Department. Bartecki testified that on June 16, 2012, at 7:09 p.m., she responded to the scene on West 70th Place, where she treated Leon. Bartecki asked Leon where he was hurt and how he was injured. Leon informed Bartecki that he had been shot but that he had a condition where he could not feel his legs. During the seven-minute drive to Christ Hospital, Leon did not say who shot him. Leon did not provide her with any details about how he was shot.

¶ 23    The defense rested, and the parties presented closing arguments. After considering the evidence and hearing closing arguments, the trial court found defendant guilty of murder and two counts of attempted first degree murder. Defendant then moved for a new trial, and the trial court denied the motion.

¶ 24    The parties proceeded to sentencing, and defendant was sentenced to a mandatory minimum aggregate sentence of 71 years' imprisonment. Defendant appealed his conviction and sentence, and we affirmed his conviction but remanded the matter for resentencing. *Joiner*, 2018 IL App (1st) 150343, ¶ 95.

¶ 25    On remand, the trial court resentenced defendant to 34 years' imprisonment. Defendant filed a motion to reconsider his sentence, which was denied. Defendant appealed his new sentence, and this court affirmed, finding that the trial court did not abuse its discretion when resentencing defendant. *Joiner*, 2020 IL App (1st) 191506-U.

¶ 26                    Postconviction Proceedings

¶ 27    The circuit court of Cook County's electronic "Case Summary" for this case indicates that on July 7, 2021, defendant filed a postconviction petition. In that same entry, it states "PC FEE NOT PAID." In the next entry, it indicates that on August 4, 2021, defendant filed a postconviction petition and states "PC FEE PAID THROUGH EFILE."

¶ 28    Defendant's postconviction petition alleged that his trial counsel was ineffective for failing to call as witnesses Marquise Gist and Darkenya Donner and for failing to cross-examine Thomas and Leon as to their criminal backgrounds. In addition, defendant alleged that the State committed a *Brady* violation, asserting that since Thomas and Leon had criminal backgrounds, the State must have offered them "favorable deals" for their testimony against defendant. Finally, defendant alleged that he was actually innocent of the crimes for which he was convicted, asserting that (1) the State likely offered Thomas and Leon "favorable deals," (2) "obtaining justice has not always been [the investigating detectives'] primary goal," (3) Thomas's and Leon's testimonies were "very questionable," (4) the physical evidence did not implicate defendant, and (5) Gist's and Donner's affidavits demonstrated that defendant was not the shooter.

¶ 29    Defendant attached to the petition two investigation reports containing a list of criminal cases against Thomas and Leon. The report regarding Thomas indicated that on June 3, 2014, Thomas was charged with retail theft and that he pled guilty on December 3, 2014. This report contained other charges against Thomas, but these charges were either dismissed or occurred after defendant's trial on October 15, 2014.

¶ 30    The report regarding Leon indicated that on October 21, 2011, Leon was charged with one count of battery and that on April 20, 2012, Leon pled guilty. This report contained other drug and weapons charges against Leon, but these charges were either dismissed or occurred after defendant's bench trial.

¶ 31    In addition, defendant attached affidavits from Gist and Donner. In his affidavit, Gist asserted that on the day of the shooting, he and defendant went to a park in the afternoon, where they talked and played basketball. Gist further asserted that later in the afternoon or early

evening, he and defendant left the park to smoke marijuana in an abandoned building. Gist and defendant then returned to the park, and someone there informed them that there had been a shooting. Gist asserted that they stayed at the park until around 8 p.m. and that the next day, Gist learned that defendant had been placed into custody.

¶ 32     In her affidavit, Donner asserted that just up until the month of the shooting, she lived on the 2000 block of West 71st Street, one block south of the 2000 block of West 70th Place. While she lived on West 71st Street, she became familiar with defendant. On the day of the shooting, she no longer lived on West 71st Street but was visiting a former neighbor who lived there. While visiting her former neighbor, Donner observed two teenage boys, neither of whom were defendant, exit a gray vehicle near West 71st Street. One of the boys was wearing a hooded sweatshirt. Donner observed the boys walk north across West 71st Street and then walk north through a vacant lot towards West 70th Place. Moments later, Donner heard gunshots coming from West 70th Place, and she observed the two boys walk south across West 71st Street and then south through a vacant lot on the south side of West 71st Street. Approximately one week later, Donner observed the boy who wore the hooded sweatshirt and took a picture of him with her cell phone. After she took the picture, she went to the police station, and two detectives interviewed her for about 30 minutes. At the end of the interview, a detective informed Donner that the police "[h]ad their guy." Donner responded that they "had the wrong child" and left the police station.

¶ 33     Finally, defendant attached to the petition Detective Meador's and Detective Delfavero's disciplinary histories, as well as a 2014 federal section 1983 action (42 U.S.C. § 1983) naming Meador as one of the defendants.

¶ 34     In a written order filed on November 1, 2021, the trial court summarily dismissed

defendant's petition. As to defendant's ineffective assistance claims, the trial court found that defendant forfeited these claims, since they could have been raised on direct appeal. In addition, the trial court found that trial counsel's performance was not deficient and trial counsel's alleged errors did not prejudice defendant. Further, the trial court found that defendant's *Brady* claim was speculative since the court could not determine from Leon's or Thomas's criminal backgrounds that the State offered any "favorable deals." Finally, the trial court rejected defendant's actual innocence claim, since the evidence on which defendant relied was not newly discovered, material, or conclusive.

¶ 35    This timely appeal follows.

¶ 36                                    ANALYSIS

¶ 37    On appeal, defendant argues that the trial court should have advanced defendant's petition to the second stage since the trial court failed to rule on the petition within 90 days after it was filed and docketed. Further, defendant argues that his petition sufficiently set forth a *Brady* violation claim, ineffective assistance of trial counsel claims, and an actual innocence claim. For the following reasons, we affirm.

¶ 38                                    The Act

¶ 39    The Act provides a method for defendants to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2020). "A proceeding under the Act is a collateral attack on the judgment of conviction." (Internal quotation marks omitted.) *People v. Smith*, 2014 IL 115946, ¶ 22.

¶ 40    The Act contains a three-stage procedure for relief. *People v. Allen*, 2015 IL 113135, ¶ 21. At the first stage, a circuit court must review a defendant's petition within 90 days after it

has been filed and docketed. 725 ILCS 5/122-2.1(a)(2) (West 2020). The circuit court shall dismiss the petition if the court determines that the petition is "frivolous or is patently without merit." *Id.* If the court does not dismiss the petition as "frivolous" or "patently without merit," then it advances to the second stage. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the second stage, counsel may be appointed to an indigent defendant. 725 ILCS 5/122-4 (West 2020); *Hodges*, 234 Ill. 2d at 10. The State must either file a motion to dismiss or file an answer within 30 days of the court's order to docket the petition. 725 ILCS 5/122-5 (West 2020); *Allen*, 2015 IL 113135, ¶ 21. To avoid dismissal, the defendant bears the burden of making a substantial showing of a constitutional violation to warrant a third-stage evidentiary hearing. *People v. English*, 403 Ill. App. 3d 121, 129 (2010). At the second stage, allegations in the petition must be supported by the record or by accompanying affidavits. *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). If the circuit court determines the defendant made a substantial showing of a constitutional violation, the petition advances to the third stage. 725 ILCS 5/122-6 (West 2020); *Allen*, 2015 IL 113135, ¶ 22. At a third-stage evidentiary hearing, the circuit court determines the credibility of the witnesses, decides the weight to be given the testimony and evidence, and resolves any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34.

¶ 41    Defendant's petition was dismissed at the first stage. To survive first-stage scrutiny, a petition must state the "gist" of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. Formal legal argument and citation of authority are not required (*id.*), and all well-pleaded facts that are not positively rebutted by the record are taken as true (*People v. Romero*, 2015 IL App (1st) 140205, ¶ 26). Further, a petition may be summarily dismissed as "frivolous or patently without merit" when it has "no arguable basis either in law or in fact," or, in other words, when the petitioner's claim relies "on an indisputably meritless legal theory or a fanciful factual allegation." (Internal

quotation marks omitted.) *People v. Boykins*, 2017 IL 121365, ¶ 9. Defendant is not excused from providing factual support for his claims, and he must assert a sufficient factual basis to demonstrate the petition's claims are " 'capable of objective or independent corroboration.' " *Allen*, 2015 IL 113135, ¶ 24.

¶ 42    We review *de novo* the summary dismissal of a postconviction petition. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). *De novo* means that we perform the same analysis that a trial judge would perform. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151.

¶ 43                     Filing and Docketing the Petition

¶ 44    Defendant first argues that the trial court should have advanced his postconviction petition to the second stage since the trial court did not rule on the petition within 90 days after it had been filed and docketed. Defendant argues that his petition was filed and docketed on July 7, 2021, and that the trial court did not rule on the petition until November 1, 2021, or 117 days after it was filed. The State responds that although defendant filed a postconviction petition on July 7, 2021, the circuit court of Cook County did not docket the petition until August 4, 2021. Therefore, we must determine when the trial court docketed the petition.

¶ 45    A circuit court must review a petition within 90 days after it has been filed and docketed. 725 ILCS 5/122-2.1(a)(2) (West 2020). "Clearly, *** the verb 'docket' connotes more than the mere act of receiving the petition." *People v. Brooks*, 221 Ill. 2d 381, 391 (2006). Rather, "[t]he plain meaning of the word connotes that the cause is entered on the court's official docket for further proceedings." *Id.* The clerk of the circuit court of Cook County will not docket a petition until a defendant pays a "docket fee" or obtains leave to file the petition *in forma pauperis*. See Cook County Cir. Ct. R. 15.4(a) (July 1, 1976).

¶ 46    To determine when the clerk for the circuit court of Cook County docketed defendant's

petition, this court may consider entries on the case's half-sheet, which is a sheet on which the clerk's office enters chronological notations of the case's procedural events. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 47 (citing *People v. Jones*, 2015 IL App (1st) 133123, ¶ 8 n.3). Half-sheet entries, also called " 'docket' " entries (*id.* (quoting *People v. Cooper*, 2015 IL App (1st) 132971, ¶ 7)), "may be relied on as some evidence of certain legal events" (*id.*).

¶ 47     In this case, the chronology of defendant's case appears in an electronic "Case Summary," which is included in the record on appeal and which contains, in relevant part, a list of "Events & Orders of the court." Up through March 2014, this summary merely lists particular events and orders, with court orders appearing to be rendered in bold font. Beginning in March 2014, however, a number of the entries begin including icons next to them, which depict a piece of paper and a magnifying glass. As relevant to the instant appeal, an entry dated July 7, 2021, provides "Post-Conviction Filed," with a note underneath stating "PC FEE NOT PAID"; there is no icon appearing next to this entry. The next entry is dated August 4, 2021, and again provides "Post-Conviction Filed." This entry has an icon appearing next to it, and a note underneath which states "PC FEE PAID THROUGH EFILE."

¶ 48     From the entries contained in the electronic case summary, it appears that defendant first attempted to file a postconviction petition on July 7, 2021, but did not pay the required fee, so this filing was not "docketed." It was only on August 4, 2021, when defendant refiled the petition and paid the fee, that the clerk of the circuit court of Cook County "docketed" the petition. See Cook County Cir. Ct. R. 15.4(a) (July 1, 1976). This is supported by the fact that an icon appears next to the entry only after the fee was paid, suggesting that the petition was not properly before the court until that point. The trial court then entered a written order dismissing the petition on November 1, 2021, or 89 days after the petition was filed and docketed. Thus, the

trial court complied with the Act and dismissed defendant's petition within 90 days after it was filed and docketed. See 725 ILCS 5/122-2.1(a)(2) (West 2020).

¶ 49 Defendant contends that since the case summary entry denotes that defendant filed his petition on July 7, 2021, we should find that his petition was docketed on that date as well. In support, defendant cites *People v. Lentz*, 2014 IL App (2d) 130332. There, the defendant filed a postconviction petition with the clerk of the circuit court of Du Page County on August 27, 2012. *Id.* ¶ 2. That filing appeared on the trial court's computerized docket. *Id.* ¶¶ 2, 15. The next day, the clerk sent a letter to the defendant's attorney, stating that a $40 filing fee was due. *Id.* ¶ 2. The defendant paid the fee on September 6, 2012. *Id.* Then, on January 25, 2013, the clerk set a hearing on the petition for January 30, 2013, and the January 25, 2013, docket entry stated that the petition was " 'placed on call by judge[']s secretary.' " *Id.* The trial court set the petition for status on March 15, 2013, and on that date, the trial court summarily dismissed the petition. *Id.* ¶ 3. In a written order, the trial court found that it had ruled within the 90-day time limit since the petition had not been docketed until the petition was " 'placed on the call of a judge and set for hearing before that assigned judge.' "[2] *Id.*

¶ 50 The defendant appealed, and the reviewing court reversed, finding that the trial court had ruled on the petition after the 90-day time limit expired. *Id.* ¶ 15. The issue on appeal was when the clerk docketed the petition. *Id.* ¶ 8. The *Lentz* court found that the petition had been docketed on the same day it had been filed: August 27, 2012. *Id.* ¶ 15. In so ruling, the *Lentz* court disagreed with the trial court's finding that the petition was docketed when it was placed on a call and set for hearing, and the *Lentz* court recited our supreme court's definition of the verb

---

[2]The trial court identified this date as January 30, 2013, in its written order (see *Lentz*, 2014 IL App (2d) 130332, ¶ 3), but the State conceded on appeal that the trial court erred and that the applicable date was January 25, 2013 (*id.* ¶ 9).

"docket," which " 'connotes that the cause is entered on the court's official docket for further proceedings.' " *Id.* ¶ 10 (quoting *Brooks*, 221 Ill. 2d at 391). Then, as evidence that the petition had been entered into the official record for further proceedings on August 27, 2012, the court in *Lentz* pointed to the docket entry stating that the postconviction petition had been filed on August 27, 2012, and to the clerk's letter stating that a $40 filing fee was due. *Id.* ¶ 15.

¶ 51    We find *Lentz* distinguishable from the case at bar. We acknowledge that the electronic case summary reflects that defendant filed his petition on July 7, 2021. This entry, however, does not demonstrate that the circuit court of Cook County entered the petition into "the court's official docket for *further proceedings*." (Emphasis added.) *Brooks*, 221 Ill. 2d at 391. Instead, the July 7, 2021, entry merely establishes that the circuit court received the petition on that date. "Clearly, *** the verb 'docket' connotes more than the mere act of receiving the petition." *Id.* Unlike the defendant in *Lentz*, defendant in this case points to no evidence that the circuit court of Cook County would have acted any further on the petition submitted on July 7, 2021. See *Lentz*, 2014 IL App (2d) 130332, ¶ 15. Moreover, the defendant in *Lentz* did pay the filing fee. See *id.* ¶ 2. On the other hand, the July 7, 2021, entry's note that defendant failed to pay the docket fee, as well as the circuit court of Cook County's local rules on filing postconviction petitions, demonstrate that the petition was not docketed on July 7, 2021, but on August 4, 2021—when defendant refiled the petition and paid the fee. See Cook County Cir. Ct. R. 15.4(a) (July 1, 1976).[3]

¶ 52    Defendant also cites *People v. Begay*, 2018 IL App (1st) 150446. There, the defendant filed a postconviction petition on December 6, 2013. *Id.* ¶ 44. The petition, however, did not

_____

[3]We note that the local rules of the Eighteenth Judicial Circuit, which includes Du Page County, do not appear to contain an analogous provision to the circuit court of Cook County's local rule concerning postconviction petitions.

appear on the case's half-sheet. *Id.* ¶ 13. The defendant then refiled the petition on May 21, 2014, and, in a docket entry dated June 26, 2014, the half-sheet reflected that the defendant filed a postconviction petition and that a hearing on the petition had been set for July 18, 2014. *Id.* ¶¶ 13-14. At that hearing, the trial court dismissed the petition. *Id.* ¶ 14.

¶ 53     On appeal, the defendant argued that the trial court erred, since it considered his petition more than 90 days after he filed it. *Id.* ¶ 24. This court, however, disagreed, finding that the 90-day time limit did not run until the petition had been filed and docketed. *Id.* ¶ 45. We further found that the petition had been docketed on June 26, 2014, or when it first appeared in the half-sheet and was set for hearing. *Id.* ¶¶ 13, 47. This court found the fact that the trial court had set a hearing on the petition was evidence that the trial court was acting further on the petition. See *id.* ¶¶ 47, 49.

¶ 54     Defendant argues that *Begay* supports his contention that a petition is filed and docketed when it first appears on a case's half-sheet. *Begay*, however, supports our conclusion. In *Begay*, this court did not find that the defendant's petition was docketed merely because it appeared in the half-sheet; we found that the petition was docketed because it appeared in the half-sheet *and* because the trial court had set a hearing on it. See *id.* ¶¶ 47, 49 (noting that the defendant's first petition did not appear on the half-sheet and was not set for a hearing, but his second one was filed, appeared on the half-sheet, and was promptly reviewed by the trial court). In other words, this court pointed to the setting of a hearing as evidence that the trial court was acting further on the petition. See *id.* Unlike in *Begay*, in this case there is no evidence that the trial court acted further on the petition that defendant had first filed. See *id.*

¶ 55     We also find both *Lentz* and *Begay* distinguishable on another point—in both cases, there was a clear explanation of the course of events occurring between the purported "filing" and

"docketing." In *Lentz*, the petition was filed in August 2012, and a letter was sent by the clerk of the court requesting the payment of the filing fee the following day. *Lentz*, 2014 IL App (2d) 130332, ¶ 2. The fee was paid in September 2012, and the petition was set for hearing in January 2013. *Id.* In *Begay*, the petition was filed in December 2013, but the clerk's office never placed the case on the court's call, despite counsel's repeated requests, so counsel ultimately refiled it in May 2014. *Begay*, 2018 IL App (1st) 150446, ¶¶ 17-19. In both cases, then, the question was whether the petition was "docketed" at the time of initial filing or at the later time, but there was no question as to the facts underlying the claims.

¶ 56    Here, by contrast, we have been provided with no explanation for the course of events between July 7, 2021, and August 4, 2021, other than what we have been able to infer from the case summary. Defendant, who was represented by counsel at the time of the filing of his petition, provides no explanation for why a petition which he claims was properly filed initially was refiled less than a month later. This is especially curious, given the fact that defendant's counsel did not enter its appearance until August 4, 2021, despite the fact that counsel appears to have prepared the initially filed postconviction petition. Instead, even though counsel on appeal is the same counsel who prepared the postconviction petition, defendant's brief merely states that "Defendant cannot explain conclusively the reason" for the different filing dates. We must also note that, during the November 1, 2021, hearing, in which the trial court dismissed the petition, the trial court expressly found that "[t]his is within the 90 days, all right, and I've reviewed it." Counsel at the time did not make any objection or otherwise indicate that he disagreed with the court's finding that the petition had been ruled upon within the proper time period.

¶ 57    Thus, we reject defendant's contention that the circuit court of Cook County docketed his petition on July 7, 2021, and we find that the trial court complied with the Act and dismissed

defendant's petition within 90 days after it was filed and docketed. See 725 ILCS 5/122-2.1(a)(2) (West 2020).

¶ 58                                    *Brady* Violation

¶ 59    Defendant next argues that his petition sufficiently alleged that the State committed a *Brady* violation. In his petition, defendant alleged that since Thomas and Leon had criminal backgrounds, the State must have offered them "favorable deals" for their testimony against defendant.

¶ 60    The United States Supreme Court established the State's affirmative duty to disclose evidence favorable to a defendant in *Brady v. Maryland*, 373 U.S. 83. *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). In *Brady*, the United States Supreme Court held that "the prosecution must disclose evidence that is favorable to the accused and 'material either to guilt or to punishment.' " *People v. Harris*, 206 Ill. 2d 293, 311 (2002) (quoting *Brady*, 373 U.S. at 87). An alleged *Brady* violation is cognizable under the Act. See *Hobley*, 182 Ill. 2d at 429. To succeed on a *Brady* claim, a defendant must demonstrate that "(1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 61    Defendant, however, failed to allege any facts supporting his claim that the State offered Thomas or Leon "favorable deals" for their testimonies. Defendant thus failed to supply any factual basis to demonstrate that his allegations were " 'capable of objective or independent corroboration.' " See *Allen*, 2015 IL 113135, ¶ 24. That the State must have promised leniency to Thomas and Leon in exchange for their testimonies was a " 'fanciful factual allegation,' " and thus, this claim had no arguable basis in fact. See *Boykins*, 2017 IL 121365, ¶ 9. Since defendant

failed to allege any facts supporting any "favorable deals," we conclude that defendant's petition failed to sufficiently set forth a *Brady* violation. See *id.*; *Allen*, 2015 IL 113135, ¶ 24.

¶ 62                                Ineffective Assistance of Trial Counsel Claims

¶ 63    Defendant next argues that he sufficiently set forth ineffective assistance of trial counsel claims, asserting that his trial counsel was ineffective for failing to call as witnesses Marquise Gist and Darkenya Donner and for failing to cross-examine Thomas and Leon Cunningham as to their criminal backgrounds.

¶ 64    The United States Constitution and the Illinois Constitution both guarantee criminal defendants the right to effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. 1, § 8; *People v. Hale*, 2013 IL 113140, ¶ 15. At the first stage under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (1) counsel's performance was arguably deficient and (2) defendant was arguably prejudiced. *Hodges*, 234 Ill. 2d at 17. However, when "it is possible to resolve an ineffective-assistance claim on the basis that the defendant suffered no prejudice as a result of counsel's allegedly defective performance, the claim may be decided against the defendant without consideration of whether counsel's performance was actually deficient." *People v. Coleman*, 168 Ill. 2d 509, 528 (1995).

¶ 65    A defendant suffers prejudice if, but for trial counsel's alleged errors, there is a reasonable probability that the outcome at trial would have been different. *Id.* at 538. A "reasonable probability" is defined as " 'a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair.' " *People v. Charles*, 2018 IL App (1st) 153625, ¶ 40.

¶ 66                                        *Gist and Donner*

¶ 67    Defendant argues that his petition sufficiently alleged that his trial counsel was

ineffective for failing to call as witnesses Marquise Gist and Darkenya Donner. We find that trial counsel's failure to present Gist or Donner as a witness did not arguably prejudice defendant by undermining our confidence in the outcome.

¶ 68     As to Gist, he asserted in his affidavit that, on the day of the shooting, he and defendant went to a park in the afternoon, left the park to smoke marijuana in an abandoned building, and then returned to the park, where someone informed them that there had been a shooting. Gist further asserted that they stayed at the park until around 8 p.m.

¶ 69     The State's case against defendant primarily rested on the victims' identifications of defendant as the shooter. On direct appeal, in response to defendant's argument that his trial counsel was ineffective for failing to move to suppress the photographic and lineup evidence, we found that defendant was not prejudiced by this alleged error because of Thomas's and Leon's identifications. *Joiner*, 2018 IL App (1st) 150343, ¶¶ 35, 47. This court assessed their identifications by applying the following factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witnesses' opportunities to view the defendant during the offense, (2) the witnesses' degree of attention at the time of the offense, (3) the accuracy of the witnesses' prior descriptions of the defendant, (4) the witnesses' level of certainty at subsequent identifications, and (5) the length of time between the crime and the witnesses' identifications. *Joiner*, 2018 IL App (1st) 150343, ¶¶ 47-54 (citing *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989)).

¶ 70     As to the witnesses' opportunities to view the offender, this court observed that Thomas viewed the shooter's face and that "Leon had ample opportunity to view the shooter." *Id.* ¶ 49. Further, this court found that "importantly, the shooter was not a random stranger [but] an individual both Leon and Thomas recognized from the neighborhood and knew [by nickname]." *Id.* Next, as to the witnesses' degree of attention, we noted Thomas's ability to recognize

defendant as the shooter and that "the testimony was clear that Leon was focused on the shooter." *Id.* ¶ 50. As to the accuracy of the witnesses' prior descriptions, we noted that Leon accurately described defendant after a detective presented him with a photo array. *Id.* ¶ 51. As to the witnesses' level of certainty, we found that Thomas and Leon "identified defendant definitively in the photo array as well as in the lineup." *Id.* ¶ 52. Finally, as to the length of time between the crime and the witnesses' identifications, we noted that Leon informed detectives that defendant was the shooter while Leon was being treated in the emergency room and that Thomas identified defendant two days after the shooting. *Id.* ¶ 53.

¶ 71   The evidence at trial demonstrated that Thomas and Leon both had opportunities to view the shooter, that Leon was focused on the shooter, that Thomas and Leon definitively identified defendant as the shooter in the photo array and lineup, and importantly, that Thomas and Leon recognized defendant from their neighborhood and knew him by nickname (see *People v. Brooks*, 187 Ill. 2d 91, 130 (1999) (finding evidence that the occurrence witness was acquainted with the defendant was "[p]erhaps the strongest factor" in favor of admitting the witness's testimony)). Given the strength of the victims' identifications, therefore, we cannot say that trial counsel's failure to present Gist as a witness arguably undermines our confidence in the outcome. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528.

¶ 72   As to Donner, she asserted in her affidavit that she observed two teenagers, neither of whom were defendant, exit a vehicle near West 71st Street. One of the boys was wearing a hooded sweatshirt. Donner further observed the boys walk north across West 71st Street and through a vacant lot towards West 70th Place. Moments later, Donner heard gunshots coming from West 70th Place, and she observed the two boys walk south across West 71st Street and then south through a vacant lot on the south side of West 71st Street. Approximately one week

later, Donner observed the boy who wore the hooded sweatshirt and took a picture of him with her cell phone. After she took the picture, she went to the police station, and two detectives interviewed her for about 30 minutes. At the end of the interview, a detective informed Donner that the police "[h]ad their guy," and Donner responded that they "had the wrong child."

¶ 73    First, Donner's affidavit does not establish that either of the two teenagers she observed committed the offenses. Instead, her affidavit asserts only that she observed two teenagers near the scene at the time of the shooting. Moreover, Detective Delfavero testified that after defendant was placed into custody, a woman came to the police station and provided information pointing to another suspect. Delfavero was asked during trial whether "Ms. Donner had an exhaustive conversation with you and your partner," and he replied, "Yes." This testimony demonstrates that when the trial court convicted defendant, it already knew that the police had been provided information pointing to a second suspect. Thus, for the foregoing reasons, we cannot say that trial counsel's failure to call Donner as a witness arguably undermines our confidence in the outcome, or that defendant arguably was prejudiced. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528.

¶ 74    Since defendant was not arguably prejudiced by trial counsel's failure to present Gist or Donner as witnesses, we need not consider whether counsel's performance was arguably deficient. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528. Therefore, we conclude that defendant failed to sufficiently set forth that his trial counsel was ineffective for failing to present Gist or Donner as witnesses.

¶ 75               *Thomas's and Leon's Criminal Backgrounds*

¶ 76    Defendant also argues that his petition sufficiently alleged that his trial counsel was ineffective for failing to cross-examine Thomas and Leon as to their criminal backgrounds.

According to the reports attached to defendant's petition, Thomas had a retail theft charge pending during defendant's trial, and Leon was charged with drug and weapons offenses after trial.[4]

¶ 77    Arrests, indictments, or charges are not admissible to impeach a witness; only a witness's convictions may be used. *People v. Bohn*, 362 Ill. App. 3d 485, 490 (2005). A witness, however, may be impeached by his or her pending charges, if they demonstrate that the witness is biased or motivated to lie. *People v. Balayants*, 343 Ill. App. 3d 602, 605 (2003). Such evidence need only give rise to the inference that the witness has something to gain by testifying. *Id.*

¶ 78    As to Thomas, defendant argues that his pending retail theft charge gave rise to the inference that he had something to gain by testifying against defendant and states "[t]hat 'something to gain' was [Thomas's] freedom." As previously discussed, however, defendant failed to allege any facts supporting that the State offered Thomas leniency in exchange for his testimony. Defendant failed to allege how Thomas, by testifying against defendant, would have "gained his freedom" or anything at all. See *id.* Thus, the petition failed to demonstrate how Thomas was biased or motivated to lie. See *id.* Further, as to Leon, defendant points to drug and weapons charges that were either dismissed prior to trial or filed after trial. First, defendant fails to cite any support for his contention that, to prove that Leon was biased or motivated, trial counsel could have cross-examined Leon as to charges dismissed prior to trial. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Moreover, trial counsel could not have cross-examined defendant as to any charges made after trial.

¶ 79    Thus, for the foregoing reasons, we cannot say that trial counsel's failure to cross-examine Thomas and Leon as to their criminal backgrounds arguably undermines our confidence

---

[4]Leon also had a prior battery conviction, as well as drug charges which were dismissed prior to defendant's trial.

in the outcome, or that defendant was arguably prejudiced. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528. Moreover, since we conclude that defendant was not arguably prejudiced by trial counsel's failure to cross-examine Thomas and Leon, we need not consider whether counsel's performance was arguably deficient. See *Hodges*, 234 Ill. 2d at 17; *Coleman*, 168 Ill. 2d at 528. We conclude that defendant failed to set forth a claim that his trial counsel was ineffective for failing to cross-examine Thomas and Leon as to their criminal backgrounds.

¶ 80                                  Actual Innocence Claim

¶ 81     Finally, defendant argues that his petition sufficiently alleged that he is actually innocent, since (1) the State likely offered Thomas and Leon "favorable deals," (2) "obtaining justice has not always been [the investigating officers'] primary goal," (3) Thomas's and Leon's testimonies were "very questionable," (4) the physical evidence did not implicate defendant, and (5) Gist's and Donner's affidavits demonstrated that defendant was not the shooter.

¶ 82     A freestanding claim of actual innocence must be based on evidence that is (1) newly discovered, (2) material, and (3) not cumulative. *Harris*, 206 Ill. 2d at 301. Evidence is newly discovered if it has been discovered since trial and could not have been discovered sooner through due diligence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). Evidence is material if it is probative of a question before the trier of fact. *People v. Favors*, 254 Ill. App. 3d 876, 888 (1993). Finally, evidence is cumulative if it adds nothing to what was already before the factfinder. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 24. Further, "[a] defendant is only entitled to relief on his claim of actual innocence if the evidence is of such a conclusive character that it would probably change the result [on] retrial." *Harris*, 206 Ill. 2d at 301.

¶ 83     First, as previously discussed, defendant failed to allege any facts supporting his claim that "favorable deals" were made between the State and Thomas and Leon. This claim, therefore,

is not " 'capable of objective or independent corroboration' " and fails to support a claim of actual innocence. See *Allen*, 2015 IL 113135, ¶ 24.

¶ 84    In addition, as to defendant's allegation that "obtaining justice has not always been [the investigating officers'] primary goal," defendant failed to allege how Meador's or Delfavero's disciplinary histories, or the 2014 federal section 1983 action naming Meador as one of the defendants, is relevant to this case. Defendant fails to allege how these disciplinary histories, or the lawsuit, were arguably probative of a question before the trier of fact. See *Favors*, 254 Ill. App. 3d at 888.

¶ 85    As to defendant's allegations that Thomas's and Leon's testimonies were "very questionable" and that the physical evidence did not implicate defendant, these allegations are not based on newly discovered evidence but rather on evidence that was known to the factfinder during trial. See *Ortiz*, 235 Ill. 2d at 334. Finally, since we have found that trial counsel's failure to present Gist or Donner as witnesses did not arguably undermine our confidence in the outcome of defendant's trial, we conclude that neither Gist nor Donner's affidavits arguably contained evidence of such a conclusive character that probably would change the result on retrial. See *Harris*, 206 Ill. 2d at 301. Accordingly, we find that defendant has failed to sufficiently set forth a claim of actual innocence.

¶ 86    Since we have found that the trial court ruled on defendant's petition within 90 days after it was filed and docketed, and having found that defendant's petition failed to set forth a claim of a *Brady* violation, claims of ineffective assistance of counsel, or a claim of actual innocence, we conclude that the trial court did not err when it summarily dismissed defendant's petition as frivolous and patently without merit. See 725 ILCS 5/122-2.1(a)(2) (West 2020).

¶ 87                                    CONCLUSION

¶ 88    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 89    Affirmed.

¶ 90    JUSTICE D.B. WALKER, dissenting:

¶ 91    The majority articulates its findings on several bases. I write to differ on only one: application of the 90-day rule to the facts in this case. I believe the trial court should have advanced defendant's postconviction petition to the second stage, since it did not rule on the petition within 90 days after it was filed and docketed.

¶ 92    There is no dispute that the defendant first filed the petition on July 7, 2021 and that the trial court ruled on it on November 1, 2021, 117 days later. The only dispute is when the petition was docketed. The majority holds that it was docketed on August 4, 2021 when the entry on the electronic "Case Summary" for Case No. 12CR1317601, which is also known as a half sheet or docket sheet, states: "Post-Conviction Filed[,] PC FEE PAID THROUGH EFILE." I disagree. I would find that the petition was not only filed but also docketed on July 7, 2021 when the entry on the docket sheet states: "Post-Conviction Filed[,] PC FEE NOT PAID."

¶ 93    An analysis of Illinois case law supports this theory. Our supreme court addressed this very issue in *Brooks*. In *Brooks*, the court stated the "verb 'docket' connotes more than the mere act of receiving the petition" and "requires that the cause be entered in an official record." *Brooks*, 221 Ill. 2d at 391. Early appellate court cases applying *Brooks* found that the petition's "Filed" stamp date was the date the cause was entered in an official record. See *Gibson v. People*, 377 Ill. App. 3d 748, 751 (2007) (referring to the "Filed" stamp date as the docket date); *People v. McCaskill*, 2012 IL App (1st) 110174, ¶ 13 (finding that where the postconviction petition was stamped "Filed" on February 16, 2010, the "petition was filed *and docketed* on

February 16, 2010," for purposes of section 122-2.1 (emphasis added)).

¶ 94    Recently, courts have further defined when a petition is docketed for postconviction proceedings. In *People v. Lentz*, 2014 IL App (2d) 130332, the court considered this 90-day requirement. *Lentz* is most factually similar to the case at bar. There, the parties agreed as to the petition filing date but disagreed as to when the petition was docketed.

¶ 95    "On August 27, 2012, the defendant timely filed a postconviction petition ***. A copy of the circuit court's computerized docket shows that the filing of the petition was entered into the circuit court's records. The next day, on August 28, 2012, the clerk sent a letter to the defendant's attorney, informing him that a $40 filing fee was due ***. The docket reflects that the fee was paid on September 6, 2012. On January 25, 2013, the clerk of the circuit court set a hearing date of January 30 for the petition." *Id.* ¶ 2.

¶ 96    The trial court agreed with the State that the docketing did not occur until the petition was set on a judge's call. *Id.* ¶ 3. The Second District appellate court reversed, agreeing with the defendant that the filing and docketing occurred on the same date. "Indeed, it appears to us that it is the usual practice of court clerks to note the filing of a postconviction petition in the official record or docket of a case on the same day that the petition is stamped 'Filed.' " *Id.* ¶ 14. In holding that both acts occurred on August 27, the *Lentz* court stated: "If the August 27, 2012, computerized docket entry stating 'post conviction petition filed' were not sufficient to show this, the letter sent by the clerk the following day regarding the filing fee necessarily showed that the petition had been 'entered into the official record.' " *Id.* ¶ 15. Notably, the *Lentz* court did not find that the filing fee had to be paid prior to the matter being docketed.

¶ 97    In *Begay*, 2018 IL App (1st) 150446, ¶ 49, the court also held that the 90-day period commenced with docketing the petition, not filing it. In that case, there was much confusion

around two different filing dates—December 6, 2013 and May 21, 2014. However, the first notation appearing in the trial court's half-sheets was for June 26, 2014. *Id.* ¶ 13. This court referred to a half-sheet entry as "a 'docket' entry." *Id.* ¶ 47. We found that "after the petition was refiled on May 21, 2014, it appeared on the half-sheet shortly thereafter [(June 26, 2014)], and the trial court acted promptly and within 90 days to review it on July 18, 2014." *Id.* The majority asserts that *Begay* found the petition to be docketed because it was both entered in the half-sheet and set for a hearing, but that is not *Begay*'s holding at all. The quoted language from *Begay* was quoting *Brooks* and adding emphasis to the "and" that did not exist in the original case. *Id.* ¶ 46. At no point in *Begay* was it established when the petition was set for a hearing, so it cannot be said that the holding of *Begay* relied on the timing of the case being set for a hearing. *Id.* Quite the opposite: such a holding would be in direct contravention of our supreme court in *Brooks*. The language in *Brooks* that was cited in *Begay*, put into fuller context states:

> "According to Black's Law Dictionary, the word 'docket,' when used in its verb form, means 'to make a brief entry in the docket of the proceedings and filings in a court case *** to abstract and enter in a book *** or to schedule (a case) for trial or some other event.' Black's Law Dictionary 517 (8th ed. 2004). The standard dictionary meaning of the verb 'docket' is 'to make a brief abstract of (a legal matter) and inscribe it in a list.' Webster's Third New International Dictionary 666 (1993). Clearly, then, the verb 'docket' connotes more than the mere act of receiving the petition, as defendant suggests. To 'docket' requires that the cause be entered in an official record. Nevertheless, we do not believe that the word 'docket' entails that the case be placed on a specific call of a judge, as the State maintains. The plain meaning of the word connotes that the cause is entered on the court's official docket for further proceedings.

The record here reveals that defendant's postconviction petition was 'docketed' within the commonly understood meaning of the word on September 20, 2002, when the clerk of the court entered the petition into the case file and set it for a hearing." *Brooks*, 221 Ill. 2d at 390-91.

¶ 98   While the final sentence notes the occurrences of September 20, 2002, as the petition being entered into the case file and being set for a hearing, the preceding analysis makes clear that the entry into the case file was the relevant action, as doing so was what docketing requires: "that the cause be entered in an official record." *Id.* at 391.

¶ 99   The *Begay* court further found that

"[i]n stark contrast to the facts of *Lentz*, (1) the petition in our case was *not* entered in the circuit court's half-sheets or docket sheets when originally filed and (2) the record shows that the clerk of the circuit court took no action until the petition was refiled. Thus, applying the *Lentz* definition of docketing to the facts of our case supports our finding that the petition was not docketed when originally filed." (Emphasis in original.) *Begay*, 2018 IL App (1st) 150446, ¶ 49.

¶ 100   *Lentz* and *Begay* support the position that a postconviction petition is docketed for purposes of section 122-2.1(a) when it is entered in the circuit court's half-sheets or docket sheets. Since the majority relies on the docket sheet for its finding that the petition was docketed on August 4, 2021, it must concede that the docket sheet is an official record. On July 7, 2021, the docket sheet stated "Post-Conviction Filed[,] PC FEE NOT PAID." The circuit court both file-stamped the defendant's petition on July 7, 2021, and made the above-described entry on its docket sheet, an official record, on that date.

¶ 101   In its analysis of *Begay*, the majority concludes, wrongly, that in that case, "this court

pointed to the setting of a hearing as evidence that the trial court was acting further on the petition" (*supra* ¶ 54) and then notes that in the case at bar, no such evidence of further action is required. However, by the majority's own interpretation of *Begay*, docketing requires that the petition be entered into the official record *and* that it be set for a hearing. Here, the majority makes no finding as to when a hearing was set and references no evidence in the record indicating when a hearing was set, so the analysis with regard to that supposed requirement favors neither the July 7, 2021 date nor the August 4, 2021 date. The analysis with regard to the requirement that is unquestionably articulated in *Brooks*, that the petition is entered into the official record, was satisfied July 7, 2021. The only logical conclusions that can follow are that the petition was docketed July 7, 2021, or that the petition was never docketed at all and the trial court failed to comply with the necessary procedures of the Act.

¶ 102    The majority also relies on the circuit court of Cook County's local rule 15.4, which sets forth *procedures* for postconviction hearings. It states that in postconviction proceedings "[t]he original petition and a copy is filed with the clerk of the Criminal Division, accompanied by the docket fee." Cook County Cir. Ct. R. 15.4(a)(i) (July 1, 1976). The rule goes on to set forth procedures for proceeding *in forma pauperis*. Nowhere does this local rule provide a definition of "docketed," and it certainly does not state that the clerk will not docket a petition until a defendant pays the docket fee or obtains permission of the court to proceed as a pauper. Even if the rule did establish, as the majority concludes, that the procedure is to not enter a petition on the half-sheet if the fee has not been paid, this analysis would not change. Here, defendant's petition has, in fact, been entered on the half-sheet or docket sheet and, therefore, pursuant to *Begay* and *Lentz*, it has been docketed. Additionally, a circuit court rule never takes precedence over supreme and appellate court opinions. *Rappeport v. Meltzer*, 208 Ill. App. 3d 555, 559

(1990).

¶ 103    Basically, the majority holds that payment of a filing fee determines when a postconviction petition is docketed. Surely, our legislature and our supreme court lacked such an intention, given that these petitions are usually sent for filing from a jail cell without benefit of counsel. This and other confusion that continues to haunt the definition of "docketed" may be good reason for our supreme court to revisit this issue.

¶ 104    In *McCaskill*, this court stated: "The 90-day time period of section 122-2.1 is mandatory, not directory, and a trial court's noncompliance with the provision renders its summary dismissal of the petition void." *McCaskill*, 2012 IL App (1st) 110174, ¶ 11 (citing *People v. Porter*, 122 Ill. 2d 64, 86 (1988)). Here, the trial court should have acted within 90 days of July 7, 2021, and its failure to do so means that this case should have advanced to the second stage. I would reverse the trial court's ruling and remand for second-stage proceedings.

¶ 105    For all of the above reasons, I respectfully dissent.

*People v. Joiner*, 2023 IL App (1st) 211553

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-13176; the Hon. Vincent M. Gaughan, Judge, presiding. |
| **Attorneys for Appellant:** | Kathleen T. Zellner and Douglas H. Johnson, of Kathleen T. Zellner & Associates, of Warrenville, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, and Zachary M. Slavens, Assistant State's Attorneys, of counsel), for the People. |